SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| ANTHONY JAMES JONES, LUIS RODRIGUEZ-BURGOS, JOSE ALTAGRACIA RODRIGUEZ, | ) Arizona Supreme Court ) No. CV-04-0216-PR ) |
| Petitioners, | ) ) Court of Appeals ) Division One ) No. 1 CA-SA 04-0099 |
| v. | ) |
| HON. JANIS A. STERLING, JUDGE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA, in and for the County of Yavapai, | ) Yavapai County ) Superior Court ) Nos. CR2002-0196 ) CR82001-0502 ) CR82002-0543 ) |
| Respondent Judge, | ) **O P I N I O N** ) |
| STATE OF ARIZONA, | ) ) |
| Real Party in Interest. | ) ) ) |

Petition for Review from Order of the Court of Appeals,
Division One
No. 1 CA-SA 04-0099

---

Order of the Superior Court of Yavapai County
The Honorable Janis A. Sterling, Judge
Nos. CR2002-0196, CR82001-0502, CR82002-0543

**VACATED AND REMANDED**

---

LAW OFFICE OF LEE BROOKE PHILLIPS, P.C.                    Flagstaff
     By:  Lee Phillips
          Natalie Jacobs
Attorneys for Petitioners

TERRY GODDARD, ATTORNEY GENERAL                           Phoenix
     By:  Cari McConeghy-Harris, Assistant Attorney General

And

SHEILA SULLIVAN POLK, YAVAPAI COUNTY ATTORNEY          Prescott
    By:  Dennis M. McGrane, Deputy County Attorney
Attorneys for Real Party in Interest

---

**H U R W I T Z**, Justice

¶1      Petitioners in these cases were charged with drug offenses following traffic stops and the discovery of drugs in the cars in which they were traveling.  They claim that the police officers who stopped the vehicles were engaged in "racial profiling," the selective enforcement of traffic laws based on race.  The issue before us is whether the defendants are entitled to the appointment of an expert witness to assist them in proving this allegation.

**I.**

¶2      Petitioners Anthony James Jones, an African-American, and Luis Rodriguez-Burgos and Jose Altagracia Rodriguez, both of whom are Latino, were in vehicles stopped by Department of Public Safety ("DPS") officers on I-17 in Yavapai County on separate occasions in 2001 and 2002 as part of a statewide drug interdiction effort.  In each case, DPS officers discovered drugs inside the vehicles.  Petitioners were thereafter arrested and charged with drug offenses.

¶3      Petitioners claimed in the superior court that the DPS officers had selectively enforced traffic laws against them and other African-American and Latino motorists and contended that

2

the drug charges against them should therefore be dismissed. Their cases were consolidated with cases of other defendants making similar allegations.

¶4     The defendants first sought document discovery from the State to support their racial profiling claim.  They offered testimony by Dr. Frederic I. Solop, Director of the Social Research Laboratory at Northern Arizona University, in support of that application.   Dr. Solop said that his preliminary analysis of data about the race of motorists stopped by DPS in Yavapai County and data on the racial composition of motorists violating traffic laws in general led him to conclude that a colorable claim of selective enforcement existed.  The superior court granted the discovery motion.

¶5     Defendants later moved pursuant to Arizona Rule of Criminal Procedure 15.9(a) for appointment of Dr. Solop as an expert witness.  The superior court denied the motion, holding that the alleged selective enforcement of traffic laws was not a defense to the drug offenses for which the defendants were charged and that the appointment of an expert therefore was not "reasonably necessary to present a defense" as required by Rule 15.9(a).

¶6     Petitioners sought special action relief in the court of appeals, which declined jurisdiction.   We granted the petition for review because the issues presented are of

statewide importance and first impression.[1]  We have jurisdiction

pursuant to Article 6, Section 5(3) of the Arizona Constitution

and Arizona Revised Statutes ("A.R.S.") § 12-120.24 (2003).

**II.**

¶7      Arizona Rule of Criminal Procedure 15.9(a) provides:

> An indigent defendant may apply for the appointment of
> an investigator and expert witness . . . to be paid at
> county expense if the defendant can show that such
> assistance is reasonably necessary to present a
> defense adequately at trial or sentencing.

The central issue in this case is whether petitioners' selective

enforcement claims could constitute a "defense" to the pending

criminal charges.

**A.**

¶8      In concluding that selective enforcement of the

traffic laws was not a defense to the drug crimes with which

petitioners are charged, the superior court primarily relied on

*Whren v. United States*, 517 U.S. 806 (1996).  In that case,

police officers patrolling a "high drug area" observed a truck

waiting at a stop sign.  *Id*. at 808.  As the police approached

the truck, it turned suddenly without signaling and sped off at

an "unreasonable" speed.  *Id.*  The officers stopped the vehicle,

purportedly to warn the driver about traffic violations, and

upon approaching the driver's window observed two large plastic

---

[1]     The superior court stayed its proceedings to allow
petitioners to seek special action relief.  We subsequently
granted a similar stay pending our disposition of this matter.

4

bags of what appeared to be crack cocaine in Whren's hands. *Id.* at 808-09. Whren and the driver of the truck were arrested and illegal drugs were retrieved from the vehicle. *Id.* at 809. The defendants were charged with federal drug offenses and moved to suppress the evidence of the drugs, arguing that the stop was justified by neither probable cause nor reasonable suspicion of drug law violations, and that the officers' traffic-violation ground for approaching the truck was pretextual. *Id.*

¶9 The *Whren* defendants, both of whom were African-American, conceded that the officers had probable cause to believe that traffic laws had been violated. *Id*. at 810. They nonetheless argued that "in the unique context of civil traffic regulations probable cause is not enough," because "a police officer will almost invariably be able to catch any given motorist in a technical violation." *Id*. (internal quotation marks omitted). This ability to stop virtually any motorist for a traffic violation raised the danger that "police officers might decide which motorists to stop based on decidedly impermissible factors, such as the race of the car's occupants." *Id*. To avoid this danger, the *Whren* defendants contended that "the Fourth Amendment test for traffic stops should be, not the normal one . . . of whether probable cause existed to justify the stop; but rather, whether a police officer, acting reasonably, would have made the stop for the reason given." *Id*.

¶10     The Supreme Court unanimously rejected the argument "that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Id*. at 813.    Instead, the Court held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."    *Id*.    Because the officers had probable cause for the traffic stop, the Court affirmed the lower courts' refusals to suppress the drugs.    *Id*. at 819.

¶11     Decisions after *Whren* have confirmed that evidence seized as a result of a traffic stop meeting "normal" Fourth Amendment standards is not rendered inadmissible because of the subjective motivations of the police who made the stop.    *See Devenpeck v. Alford*, 125 S. Ct. 588, 593-94 (2004); *Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001).    Therefore, to the extent that petitioners here sought the appointment of an expert to support a Fourth Amendment argument for suppression of the seized drugs because of the alleged racial motivations of the arresting officers, the superior court properly concluded that *Whren* barred such a "defense."

**B.**

¶12     *Whren*, however, did not approve selective enforcement of traffic laws, nor did it hold that proof of such selective enforcement is irrelevant in the defense of a resulting criminal

6

case. Rather, Justice Scalia, writing for a unanimous court, emphasized:

> We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.

*Whren*, 517 U.S. at 813. Thus, even though the selective enforcement claims in this case provide no basis for suppression of evidence under the Fourth Amendment, the question remains as to whether the petitioners may nonetheless be entitled to expert assistance to prove a Fourteenth Amendment defense to the criminal charges.

¶13 As Justice Scalia noted in *Whren*, it is beyond contest that race-based selective enforcement of the law violates the Equal Protection Clause of the Fourteenth Amendment. *Id*. "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp*., 345 F.3d 1157, 1167 (10th Cir. 2003). Just as a state cannot enact criminal laws applicable on their face only to African-Americans or Latinos, neither can its agents enforce facially neutral laws on the basis of race. A state can no more make

7

"driving while Black" a crime by means of its enforcement policies than it could by express law.

¶14     The State's briefing readily and correctly concedes this.  The State contends, however, that proof of selective enforcement of traffic laws is not a defense to a criminal charge, but rather entitles injured parties only to civil redress pursuant to 42 U.S.C. § 1983.  It therefore argues that appointment of an expert to assist in proof of selective enforcement is not, in the words of Rule 15.9(a), "reasonably necessary to present a defense adequately at trial and sentencing."

¶15     Selective enforcement of traffic laws on the basis of race can give rise to a § 1983 claim.  *See, e.g., Johnson v. Crooks*, 326 F.3d 995 (8th Cir. 2003); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002); *Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001); *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997).  But the fact that a § 1983 claim is an *available* remedy for selective enforcement does not make it the *exclusive* remedy.  No case cited by the State so holds, and we are aware of none.  And although *Whren* does not speak to the issue directly, a long line of precedent establishes that proof of a violation of the Fourteenth Amendment through selective enforcement or selective

8

prosecution can be offered by a defendant in defense of criminal charges.

¶16     The seminal case is *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).  The case involved a San Francisco ordinance prohibiting laundries in wooden buildings except with a permit from the board of supervisors.  *Id*. at 368, 373.  Yick Wo was convicted of operating a laundry in a wooden building without a permit and sought habeas corpus relief in the California courts.  After relief was denied, he appealed to the Supreme Court of the United States.

¶17     The Supreme Court noted that the underlying ordinance was facially neutral as to race: it was "fair on its face, and impartial in appearance."  *Id.* at 373.  However, the record made plain that Yick Wo and 200 other Chinese "subjects" had petitioned the board of supervisors for permission to operate laundries in wooden buildings and that each such application had been denied.[2]  Eighty non-Chinese laundry operators applied for such permission and all but one application was granted.  *Id*. at 374.  Thus, the Court concluded:

---

[2]     The Court noted that Yick Wo and the defendant in the consolidated case "have complied with every requisite deemed by the law, or by the public officers charged with its administration, necessary for the protection of neighboring property from fire, or as precaution against injury to the public health."  *Yick Wo*, 118 U.S. at 374.

9

> [T]he facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all persons, by the broad and benign provisions of the fourteenth amendment to the constitution of the United States.

*Id.* at 373. Given this Fourteenth Amendment violation, the Court held that "the imprisonment of the petitioners is therefore illegal, and they must be discharged." *Id*. at 374.

¶18    Although the selective enforcement claim in *Yick Wo* was somewhat different than the one here, the case squarely stands for the proposition that violation of the Equal Protection Clause by authorities enforcing a facially neutral law can result in dismissal of resulting criminal charges. As the Court put the matter:

> Though the law itself may be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and unequal hand, so as to practically make unjust and illegal discriminations between persons in similar circumstances . . . the denial of equal justice is still within the prohibition of the constitution.

*Id*. at 374. This is precisely what the petitioners before us are now claiming — that facially neutral traffic laws were enforced against them because of their race, while not being enforced against similarly situated White persons.

10

**¶19**     *Whren* does not call the basic holding of *Yick Wo* into question.  Indeed, numerous decisions after *Whren* have treated selective enforcement of facially neutral traffic laws as a potential defense to non-traffic criminal charges arising from a traffic stop.  *See, e.g., United States v. Barlow*, 310 F.3d 1007 (7th Cir. 2002); *United States v. Bell*, 86 F.3d 820 (8th Cir. 1996); *United States v. Alcaraz-Arellano*, 302 F. Supp. 2d 1217 (D. Kan. 2004); *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172 (D. Kan. 2003); *State v. Ballard*, 752 A.2d 735 (N.J. Super. Ct. App. Div. 2000).[3]  The State is thus incorrect in asserting that a § 1983 claim is the sole remedy for selective enforcement.

## c.

**¶20**     The State also contends that even if § 1983 does not provide the exclusive remedy for selective enforcement based on race, proof of such conduct is nonetheless not a "defense" for

---

[3]     Similarly, courts have long entertained Fourteenth Amendment "selective prosecution" challenges to criminal prosecutions.  *See, e.g., Wayte v. United States*, 470 U.S. 598 (1985); *Oyler v. Boles*, 368 U.S. 448 (1962); *State v. Montano*, 204 Ariz. 413, 428 ¶¶ 78-79, 65 P.3d 61, 76 (2003); *State v. Deddens*, 112 Ariz. 425, 430, 542 P.2d 1124, 1129 (1975).  In *United States v. Armstrong*, the Supreme Court stated that it had "never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of race."  517 U.S. 456, 461 n.2 (1996).  Given the procedural posture of the case now before us, we likewise express no opinion as to the proper remedy if the superior court determines that petitioners have been the victims of selective enforcement.

purposes of Rule 15.9(a).  The State relies primarily on *United States v. Armstrong*, 517 U.S. 456 (1996).  The defendants in that drug case alleged that they were the victims of selective prosecution and sought discovery from the government to support their allegations that similarly situated suspects of other races had not been prosecuted.  *Id.* at 459.[4]

¶21     The Supreme Court first considered whether the requested discovery was mandated by then Federal Rule of Criminal Procedure 16(a)(1)(C), which required disclosure of items "material to the preparation of the defendant's defense." *See id.* at 461-62.[5]  While noting that a selective prosecution claim might well meet the general definition of a "defense," the Court concluded that Rule 16(a)(1)(C) was limited to "defenses in response to the Government's case in chief."  *Id.* at 462. The Court held that "[a] selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  *Id.* at 463.   The State urges us to interpret the term "defense" in Rule 15.9(a) in a similar fashion.

---

[4]     Selective enforcement and selective prosecution claims are both governed by the analysis generally applicable to Equal Protection claims.  *Barlow*, 310 F.3d at 1010.

[5]     In 2002, Rule 16(a)(1)(C) was relettered as Rule 16(a)(1)(E) and stylistically amended.

12

¶22    We decline that invitation. As an initial matter, it is important to note that *Armstrong* did not hold that the Fourteenth Amendment cannot be raised as a defense in a criminal trial. To the contrary, while rejecting the notion that disclosure of certain materials in support of such a claim was mandated by Rule 16(a)(1)(C), the Court reviewed in detail the standards of proof applicable to Fourteenth Amendment claims of selective prosecution. *Id.* at 463-68. The Court next turned to the showing necessary to obtain discovery in support of a selective prosecution claim, concluding that a defendant is entitled to such discovery only after "a credible showing of different treatment of similar situated persons." *Id*. at 470. That discussion necessarily assumes that proof of selective prosecution can be used in defense of criminal charges; otherwise, discovery of material in support of such a claim would be a wholly useless exercise in the criminal case.

¶23    More importantly, we believe that the term "defense" in Rule 15.9(a) is not limited to what the Court in *Armstrong* called a "defense on the merits," but is intended to encompass the common understanding of the term — "any set of identifiable conditions or circumstances which may prevent a conviction for an offense." Paul H. Robinson, *Criminal Law Defenses: A Systematic Analysis*, 82 Colum. L. Rev. 199, 203 (1982); *see also* Black's Law Dictionary 430-31 (7th ed. 1999) (defining "defense"

13

as "[a] defendant's stated reason why the . . . prosecutor has no valid case"). Our conclusion is supported by the structure of Rule 15. For example, Rule 15.2(b) requires a defendant to "provide a written notice to the prosecutor specifying all defenses as to which the defendant intends to introduce evidence at trial, including, but not limited to, alibi, insanity, self-defense, defense of others, entrapment, impotency, marriage, insufficiency of a prior conviction, mistaken identity, and good character." The comment to Rule 15.2(b) emphasizes that "the 'notice of defenses' [is intended] to be a broad disclosure of the defendant's case, including his rebuttal of the state's case as well as his own 'case-in-chief,'" and "goes considerably beyond notification of 'affirmative defenses.'" Under the language of Rule 15.2(b), a claim of selective enforcement is surely a "defense" of which notice must be given to the State by the defendant. *See* Robinson, 82 Colum. L. Rev. at 231-32 (characterizing certain defenses as "nonexculpatory public policy defenses").[6] We see no reason to interpret the word "defense" more narrowly in Rule 15.9(a) than in Rule 15.2.

**¶24** This broad reading of Rule 15.9(a) finds additional support in the language of the Rule itself. The Rule allows

---

[6] Similarly, while a defendant's claim that prosecution was barred by the statute of limitations or double jeopardy would likely not meet the *Armstrong* definition of a "defense on the merits," each surely falls within the broad category of "defenses" for which notice is required under Rule 15.2(b).

14

appointment of an expert when the defendant can show "that such assistance is reasonably necessary to present a defense at trial *or sentencing*." (Emphasis added.) A defendant does not, of course, present a defense on the merits at sentencing; he instead argues for leniency. Because the Rule expressly contemplates that such arguments qualify as a "defense," arguments of constitutional violations deserve no lesser treatment.[7]

**D.**

¶25 The State next argues that Rule 15.9(a) permits only the "appointment of experts to be used *at trial* on defense issues, not on *pre-trial issues*, such as the one involved in this litigation." We do not read the phrase "at trial or sentencing" in Rule 15.9 so narrowly. Instead, that phrase encompasses the whole of a criminal proceeding at the trial court: the pretrial phase, the trial phase, and the judgment and sentencing phase.

¶26 In this case, the petitioners seek the services of an expert in support of a motion to dismiss or, in the alternative,

---

[7] The State also argues that because common law affirmative defenses have been abolished in Arizona, *see* A.R.S. § 13-103(A) (2001), selective enforcement cannot be a "defense" for purposes of Rule 15.9(a), as it is not provided for by statute. Section 13-103(A), however, plainly cannot prevent a defendant from raising *constitutional* defenses to a criminal charge. A selective enforcement claim, as *Whren* makes clear, arises under the Fourteenth Amendment, not under Arizona statutes or the common law.

15

a motion to suppress.  While it is true that a defendant must normally make these motions before trial, Ariz. R. Crim. P. 16.1(b) and (c), nothing precludes a trial court judge from deferring ruling on a Rule 16 motion until after trial begins. *Cf.* Ariz. R. Crim P. 16.3(c) and (d) (allowing a trial judge to take additional evidence on motions at proceedings "subsequent" to an omnibus pretrial hearing).

¶27     More importantly, the State's reading of Rule 15.9(a) would present potentially serious constitutional concerns.  The denial of expert witness assistance to a criminal defendant can violate the Due Process Clause of the Fourteenth Amendment.  *See Ake v. Oklahoma*, 470 U.S. 68, 76-77 (1985) (involving the appointment of a psychiatrist in a capital case); *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1987) (holding that the due process rationale of *Ake* applies to all criminal defendants and expert witnesses).  Due process requires the appointment of an expert when such testimony is "reasonably necessary" for an indigent defendant to present a defense.  *See State v. Gonzales*, 181 Ariz. 502, 511, 892 P.2d 838, 847 (1995) (holding that the "reasonably necessary" standard in the statute governing appointment of expert witnesses in capital cases is the same as the threshold showing required under *Ake*); *Jacobson v. Anderson*, 203 Ariz. 543, 545 ¶ 5, 57 P.3d 733, 735 (App. 2002).  In those cases in which a defendant requires expert

16

assistance to raise a constitutional defense in a pretrial proceeding, we would at the least be confronted with a constitutional dilemma if we read our own rules as precluding the appointment of an expert. When we can, as here, avoid constitutional doubt by interpreting a rule in a manner that does no violence to its text, we will adopt that interpretation. *See Greyhound Parks of Ariz., Inc. v. Waitman*, 105 Ariz. 374, 377, 464 P.2d 966, 969 (1970).

## III.

¶28      For the reasons above, we hold that the superior court erred in concluding that a showing of selective enforcement can never be a defense to a criminal prosecution. It does not follow, however, that the superior court must grant the Rule 15.9(a) application before it in these consolidated cases.

¶29      Rule 15.9(a) mandates the appointment of an expert witness only when "such assistance is *reasonably necessary* to present a defense adequately at trial or sentencing." (Emphasis added.) We have held, in interpreting substantially identical language in the statute governing appointment of experts in capital cases, that the decision rests in "the sound discretion of the trial court." *State v. Gretzler*, 126 Ariz. 60, 90, 612 P.2d 1023, 1053 (1980) ("A.R.S. § 13-1673(B) [now A.R.S. § 13-4013(B)] is not to be construed as mandating, in every case, an appointment of investigators or experts, nor the expenditure of

17

public money for their use, merely upon application."); *State v. Apelt*, 176 Ariz. 369, 375, 861 P.2d 654, 660 (1993) ("Mere undeveloped assertions that the requested assistance would be beneficial are not enough.") (internal citation and quotation marks omitted).

¶30    The determination of what is "reasonably necessary" to prove selective enforcement requires at the outset an analysis of the elements of such a claim. Because a selective enforcement claim rests on an assertion that the Equal Protection Clause has been violated, the claimant must demonstrate that state action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *see Barlow*, 310 F.3d at 1010 (holding that the same Fourteenth Amendment analysis governs selective prosecution and selective enforcement claims). "To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not [stopped]." *Armstrong*, 517 U.S. at 465.

¶31    As the Supreme Court emphasized in *Armstrong*, this Fourteenth Amendment test imposes a "demanding standard" of proof as a "significant barrier to the litigation of insubstantial claims." *Armstrong*, 517 U.S. at 463-64. This "rigorous standard," *id.* at 468, is necessary because a selective enforcement claim, like a selective prosecution claim,

18

"asks a court to exercise judicial power over a 'special province' of the Executive." *Id*. at 464 (quoting *Heckler v. Chaney,* 470 U.S. 821, 832 (1985)). The Arizona Constitution, like its federal counterpart, charges the executive branch with the duty to ensure that the "laws be faithfully executed." *Compare* Ariz. Const. art. 5, § 4 *with* U.S. Const. art. II, § 3. The executive is thus afforded "broad discretion" in enforcing the law. *Wayte v. United States*, 470 U.S. 598, 607 (1985). Decisions about who should be arrested and prosecuted are, in general, "not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.*

¶32     Caution is also required because a selective enforcement or selective prosecution claim is easily asserted, and responding to such a charge may be expensive, time consuming, and unduly distracting. *See Armstrong*, 517 U.S. at 468.[8] Thus, "the required threshold" in *Armstrong* for discovery was designed to "balance[] the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id*. at 470; *accord Ballard*, 752 A.2d at 741 ("The threshold test . . . constitutes a reasonable accommodation of

---

[8]     For example, in this case copying costs for discovery are already nearly $7,000; the cost of completing the requested study has been estimated at anywhere between $10,000 and $72,000; and some of the consolidated defendants in this case were indicted nearly four years ago but have not yet proceeded to trial.

19

competing values. A more lenient standard would encourage the assertion of spurious claims of selective enforcement as a means of burdening criminal trials with massive discovery of material completely irrelevant to the defendant's case.").

**¶33** We believe that the *Armstrong* standard, although articulated in the context of discovery, is equally appropriate in evaluating requests under Rule 15.9(a) for the appointment of experts to prove selective enforcement claims. In such cases, the trial court should determine whether the defendant has presented credible evidence of both discriminatory effect and intent before appointing an expert. Moreover, in determining whether an expert is "reasonably necessary," the superior court may consider that "[w]hile helpful, purely statistical evidence is rarely sufficient to support an equal protection claim." *Mesa-Roche*, 288 F. Supp. 2d at 1188. *See McCleskey v. Kemp*, 481 U.S. 279, 293-94 (1987) (stating that statistics alone will not prove selective prosecution in all but the rarest of cases).[9]

---

9   While statistics conceivably could prove discriminatory effect in some cases, *see Chavez*, 251 F.3d at 639-40; *Mesa-Roche*, 288 F. Supp. 2d at 1188, they generally will not suffice in proving the discriminatory intent prong of the Fourteenth Amendment claim, *see Chavez*, 251 F.3d at 647-48 (holding that in the context of a traffic stop, "statistics may not be the sole proof" of discriminatory intent); *Mesa-Roche*, 288 F. Supp. 2d at 1192-96 (holding that defendant had not made required showing where discriminatory effect was shown by statistics, but no showing of discriminatory intent). *Cf. State v. Soto*, 734 A.2d 350, 357 (N.J. Super. Ct. Law Div. 1996) (finding a *prima facie* case of selective enforcement in light of statistics *and* direct

20

¶34 In addition, a superior court confronted with a Rule 15.9(a) motion in a case like this should make at least preliminary inquiry as to the nature of the statistical evidence that a defendant hopes to produce before determining whether an expert will be "reasonably necessary" to present a defense. To support a Fourteenth Amendment claim, statistics must be both "relevant and reliable." *Barlow*, 310 F.3d at 1011. They must show not a disparity in the number of motorists of each race stopped by police, but rather that police treated the defendants differently than other similarly situated motorists of another race. *See United States v. Bass*, 536 U.S. 862, 863-64 (2002) (noting that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*"); *United States v. Turner*, 104 F.3d 1180, 1185 (9th Cir. 1997) (finding proffered statistical study did not focus on similarly situated defendants). Statistics should also be reliable. *Id.* (finding proffered study was "based on a statistically unimpressive number of federal defendants"); *Alcaraz-Arellano*, 302 F. Supp. 2d at 1229-31 (finding racial profiling study unreliable because benchmark data was not

testimony by former troopers about having been trained and coached to make race-based profile stops).

sufficiently reliable and the stop data lacked trustworthiness).[10]

**IV.**

¶35        In the case before us, the superior court has not yet had the occasion to analyze the defendants' request for an appointment of an expert under the standards articulated above. Although the defendants claim to have credible evidence of both discriminatory effect and discriminatory intent and assert that the proposed study will produce relevant and reliable information, it is not appropriate in the context of this case for us to evaluate those claims in the first instance. Therefore, while we vacate the order of the superior court denying the application of the defendants for appointment of an expert, we remand to the superior court for further proceedings consistent with this opinion.

_____
                              Andrew D. Hurwitz, Justice


CONCURRING:


_____
Charles E. Jones, Chief Justice

_____

[10]    In contrast, in *Mesa-Roche*, the court found discriminatory effect after analyzing studies that accounted for both the "transient motor population" and "violator" benchmarks.  288 F. Supp. 2d at 1179-82, 1188-92.

_____
Ruth V. McGregor, Vice Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice